## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SCOTT LANE McCORMICK,

          Plaintiff,

vs.

MAQUET CARDIOVASCULAR US
SALES LLC,

          Defendant.

Civ. No. 2:15-cv-7670-KM-MAH

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Scott Lane McCormick sues his former employer, defendant Maquet Cardiovascular US Sales, LLC ("Maquet"). McCormick alleges that he reported potentially illegal conduct, and that in retaliation Maquet asked him to resign. McCormick sues under New Jersey's Conscientious Employee Protection Act. Now before the court is defendant Maquet's motion for summary judgment. For the reasons stated below, that motion is denied.

### I.    BACKGROUND[1]

#### A. Beginning of Employment

The defendant, Maquet Cardiovascular US Sales, LLC, designs, develops, and sells business solutions and infrastructure functions for hospitals. (DSF ¶ 1; PRSDF ¶ 1). Maquet sponsors conferences that include courses in which

---

[1]     Certain citations to the record are abbreviated as follows:

       "DSF" = Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment by Maquet Cardiovascular US Sales, LLC (ECF No. 77-4)

       "PRDSF" = Plaintiff's Response to Defendant's Statement of Undisputed Facts (ECF No. 78-2)

healthcare providers learn utilization strategies and new applications for Maquet's products. (DSF ¶ 2; PRSDF ¶ 2).

The plaintiff, Scott Lane McCormick, applied for a position with Maquet around January 2014. (DSF ¶ 3; PRDSF ¶ 3). He started on February 9, 2014 as a Regional Manager, Cardiovascular (Level II), with responsibility for the Great Lakes Territory. (DSF ¶ 4; PRDSF ¶ 4). McCormick was employed at will and subject to a six-month probationary period, in accordance with Maquet's standard policy for new employees. (DSF ¶ 5; PRDSF ¶ 5). McCormick managed a team of employees and reported to Therese Mueller, then the Area Director for the Central Area; she was responsible for evaluating his performance. (DSF ¶ 6; PRDSF ¶ 6).

### B. McCormick's Responsiveness

Maquet contends that Mueller began "having concerns with [McCormick's] responsiveness and lack of engagement with his team" within the first few weeks of his employment. (DSF ¶ 7). McCormick disputes this and claims that Maquet provides insufficient evidence that Mueller had concerns in March 2014. (PRDSF ¶ 7).

Maquet states that, on March 21, 2014, Mueller discussed with McCormick a report she received about his lack of engagement during conference calls with his team. (DSF ¶ 8). Mueller spoke with McCormick "about his level of engagement with the team and making sure he was setting up 1:1 calls with his team and reviewing not only their needs, expectations, but upcoming field rides." (ECF No. 77-2, ex. L, MAQUET 000188).

On March 31, 2014, McCormick replied to an email from Mueller about his failure to incorporate sales into forecasting information. (DSF ¶ 9; ECF No. 77-2, ex. M, MAQUET 000097). McCormick responded, "It is painfully evident to me that I do not yet have a good handle on hardware forecasting. I embarrassed myself last week. I commit to figuring out where I need to be getting this information and provide timely and accurate weekly updates." (ECF No. 77-2, ex. M, MAQUET 000102).

According to Maquet, on April 16, 2014, Charles Merchant, Maquet's Regional Vice President for Training and Development for the Americas, learned that McCormick failed to respond to emails about a training opportunity. (DSF ¶ 10). McCormick asserts that the training invitation occurred in person and claims that there is no evidence of an email invitation. (PRDSF ¶ 10).

Merchant requested that all managers nominate members of their team to attend an advanced training program. (DSF ¶ 12; PRDSF ¶ 10). McCormick did not respond for nearly a week, even after Merchant followed up twice. (DSF ¶ 12; PRDSF ¶ 12). McCormick adds that he was trying to figure out which people needed which training and therefore needed more time to respond. (PRDSF ¶ 12). Merchant testified that McCormick lacked responsiveness and that this was unusual for new hires. (DSF ¶ 13). McCormick denies that he lacked responsiveness. (PRDSF ¶ 13).

Mueller, too, had concerns about McCormick's responsiveness. (DSF ¶ 14). She states that McCormick frequently did not respond to emails within twenty-four hours, and would not notify people that he was unavailable. (DSF ¶ 14). According to Mueller, the twenty-four-hour response rule was a "rule of thumb" and not a written policy. (PRDSF ¶ 14).

According to McCormick, Mueller regularly cancelled meetings and phone calls, and also responded late to phone calls and emails. (PRDSF ¶ 14) Merchant allegedly took a week to respond to one request by McCormick. (PRDSF ¶ 14) Chris Woycke, McCormick's subordinate, stated that McCormick usually replied in twenty-four to forty-eight hours. (PRDSF ¶ 14).

In May, Mueller emailed McCormick, asking, "Is everything OK? I sent several emails and have not heard back from you." (DSF ¶ 15; PRDSF ¶ 15). Seven hours later, McCormick responded, stating that he could not explain how he "missed the multiple emails yesterday." (DSF ¶ 16; PRDSF ¶ 16). Around this time, another Maquet employee emailed McCormick to ensure that he was receiving his emails because he, too, had not received a response. (DSF ¶ 18; PRDSF ¶ 18).

According to Maquet, Mueller spoke with McCormick in May about his lack of engagement at training, tendency to leave the room while on his phone, and lack of responsiveness. (DSF ¶ 20). McCormick disputes that this conversation ever happened. (PRDSF ¶ 20).

Maquet claims that McCormick failed to approve twelve expense reports on time. (DSF ¶ 21). McCormick claims that they were submitted in a timely manner. (PRDSF ¶ 21).

Maquet claims that McCormick failed to obtain credentials on schedule; this allegedly prevented him from accessing customer accounts. (DSF ¶ 22). McCormick states that he actively worked on his credentials and training; he claims the emphasis on the "so-called credentialing" in June and July 2014 was part of the retaliation against him for reporting allegedly illegal activity. (PRDSF ¶ 22).

On June 24, 2014, McCormick received an email by a Maquet employee that said his training certifications were "non-compliant." (DSF ¶ 23; ECF No. 77-2 ex. P-R). McCormick replied that he had been very busy and would finish the trainings the following week on vacation. (ECF No. 77-2, ex. P). He submitted the certifications on July 8, 2014. (ECF No. 77-2, ex. Q).

According to Maquet, several individuals spoke to McCormick about his certifications. (DSF ¶ 14). McCormick alleges that he was not told the training was "required" and that there was not an emphasis on training until after he reported allegedly illegal activity. (PRDSF ¶ 24).

### C. Cleveland Endoscopic Vessel Harvesting Course

Maquet was scheduled to host an Endoscopic Vessel Harvesting Course in Cleveland, Ohio (the "Cleveland Course"). (DSF ¶ 25; PRDSF ¶ 25). On May 28, 2014, Chris Woycke, a Territory Manager who reported to McCormick, emailed Susan Mondano, a Customer Education Specialist at Maquet. (DSF ¶ 26; PRDSF ¶ 26). Woycke wrote that he wanted to bring a vein harvester and also the hospital's Cardiovascular Operating Room Manager (the "CVOR Manager") to the Cleveland Course, and he requested a hotel room for the

CVOR Manager. (DSF ¶ 26; PRDSF ¶ 26). According to Maquet, Mondano asked Woycke for an email showing that McCormick had approved the request. (DSF ¶ 26; PRDSF ¶ 26). McCormick alleges that he approved the hotel request for the vein harvester only. (PRDSF ¶ 26; ECF No. 77-2, ex. T).

On May 30, 2014, Mondano wrote to Woycke and explained that observers were not approved to attend the program; Woycke acknowledged this. (DSF ¶ 30; PRDSF ¶ 30). According to Maquet, Maquet's policy did not permit observers to attend the Cleveland Course. (DSF ¶ 31).

On June 13, 2014, Tracy Flanigan, a Cardiovascular Account Manager on McCormick's team, emailed McCormick to say that Woycke had brought "a customer" to the Cleveland Course. (DSF ¶ 31; PRDSF ¶ 31). Flanigan also reported that she refused to book an additional hotel room and that Woycke, in response, was disrespectful to her. (DSF ¶ 31; PRDSF ¶ 31). McCormick claims that this reflected a misunderstanding; he did not know the "customer" was the CVOR Manager until June 17, 2014. (PRDSF ¶ 32).

On June 13, 2014, Flanigan called Merchant and reported her concerns. (DSF ¶ 33; PRDSF ¶ 33). Flanigan then emailed McCormick to request that he contact her; she mentioned that Merchant might contact McCormick regarding Woycke's actions. (DSF ¶ 34; PRDSF ¶ 34). Flanigan, emailing McCormick on Friday (evidently June 13, 2014), requested that they speak about the incident on Tuesday (evidently June 17, 2014). (ECF No. 77-2, ex. S, MAQUET 000058, 69). McCormick replied to Flanigan's email later on June 13, 2014 and agreed to discuss the matter on Tuesday. (*Id.*).

After speaking with Flanigan, Merchant contacted Mondano. Mondano confirmed that Woycke—and another Territory Manager, Gary Cowoski—had been told that the CVOR Manager could not attend the Cleveland Course. (DSF ¶ 35; PRDSF ¶ 35). Merchant then called McCormick and left a message about this matter. (DSF ¶ 36; PRDSF ¶ 36). Merchant also contacted Chris Odom, Maquet's then-Vice President of Sales, regarding Woycke's actions. (DSF ¶ 37; PRDSF ¶ 37).

McCormick claims that the CVOR Manager's attendance may have violated an anti-kickback statute. (PRDSF ¶ 31). Merchant testified that the CVOR Manager's attendance at the Cleveland Course did not raise any red flags with respect to any anti-kickback statute. The CVOR Manager, said Merchant, could have had any number of legitimate reasons to attend; for example, she could have sought to expand her utilization of the featured product or to see how a larger institution utilizes the product. (DSF ¶ 39; PRDSF ¶ 31).

### D. McCormick's Alleged Whistleblowing

McCormick says that he contacted human resources about Flanigan's concerns with Woycke the next business day, Monday, June 16, 2014. (PRDSF ¶ 41).

When Flanigan and McCormick spoke, Flanigan stated that Woycke had taken the CVOR Manager to the Cleveland Course contrary to Mondano's direction. (DSF ¶¶ 42-43; PRDSF ¶¶ 42-43). McCormick called Cowoski to confirm that the CVOR Manager had been provided with food, entertainment, and lodging. (DSF ¶¶ 43-44; PRDSF ¶¶ 43-44).

McCormick then called Merchant on June 17, 2014. (DSF ¶ 45; PRDSF ¶ 45). Merchant testified that he was concerned that McCormick had not returned his call for almost five days. (DSF ¶ 45). McCormick states that he did not know about the potentially illegal conduct for five days because Flanigan requested, on Friday, that they speak on Tuesday to accommodate her vacation schedule. (PRDSF ¶ 45). Merchant told McCormick that he had started an investigation. (DSF ¶ 47; PRDSF ¶ 47). McCormick claims he warned Merchant that Woycke's actions may have constituted an anti-kickback statute violation. (PRDSF ¶ 47).

McCormick testified that his understanding of the anti-kickback statutes was that "food and beverages are to be provided in very modest amount only in the context of a bona fide educational setting for participants who in fact have a need to receive that education." (DSF ¶ 50; PRDSF ¶ 50). McCormick

acknowledged that he had taken clients or people from medical facilities out for dinner, where they discussed clinical journals, surgical technics, product preferences, and other such matters. (DSF ¶ 51; PRDSF ¶ 51).

McCormick testified that he had never personally spoken to the CVOR Manager. (DSF ¶ 54; PRDSF ¶ 54). According to Maquet, McCormick claims no one told him that the CVOR Manager was attending the Cleveland Course so that Woycke and Cowoski could gain favor with her and make her more likely to use Maquet's products. (DSF ¶ 54). According to McCormick, Woycke and Cowoski told him they wanted to bring the CVOR Manager because she is an important customer and she had friends attending the conference. (PRDSF ¶ 54).

McCormick claims that Mueller thought at the time that Woycke should be severely disciplined for violating Maquet's directive not to bring the CVOR Manager. (DSF ¶ 56; PRDSF ¶ 56).

### E. Sanders Interview with Woycke

A. George Sanders, then-Vice President of Human Resources for the Americas, began an investigation on June 17, 2014 after Merchant told him about Woycke's actions. (DSF ¶ 57; PRDSF ¶ 57). On June 23, 2014, Sanders interviewed Woycke. (DSF ¶ 58; PRDSF ¶ 58). Woycke claimed that he brought the CVOR Manager because she was with the vein harvester when he went to pick her up. (DSF ¶ 59; PRDSF ¶ 59). He claimed he was in a dilemma: if he did not let the CVOR Manager go, she would be an unhappy customer; if did he let her go, he would violate Maquet's approved list of attendees. (DSF ¶ 59; PRDSF ¶ 59).

Woycke claimed that he did not call McCormick about the situation because he needed an immediate answer, and McCormick typically took twenty-four to forty-eight hours to respond to phone calls. (DSF ¶ 60; PRDSF ¶ 60). Woycke allegedly did not attempt to call McCormick on that day about the situation. (PRDSF ¶ 60).

Woycke claims that he did not pay any of the CVOR Manager's expenses, but admits that she ate the provided lunch. (DSF ¶¶ 61-64). According to McCormick, Woycke and Cowoski paid for the CVOR Manager's meals, hotel, and entertainment during the seminar. (PRDSF ¶¶ 61-64).

Sanders had a brief conversation with McCormick about the situation with the CVOR Manager. (DSF ¶ 67; PRDSF ¶ 67). The conversation was mostly about the potential impact on Woycke's employment. (DSF ¶ 67; PRDSF ¶ 67). McCormick did not raise any concerns about Maquet's having paid for the CVOR Manager's meals, hotel, or entertainment with respect to any anti-kickback statute or otherwise. (DSF ¶ 67; PRDSF ¶ 67).

On July 8, 2014, Sanders concluded his investigation into the Cleveland Course incident and recommended that Woycke's employment be terminated for "willful and intentional violation of company directives and for failure to report the attendance of a healthcare provider at a company-sponsored workshop. (DSF ¶ 68; PRDSF ¶ 68). Woycke ultimately resigned in lieu of termination. (DSF ¶ 68; PRDSF ¶ 68). Cowoski received a disciplinary write-up for "failing to adhere to Maquet's Communications and Employee Standards Policy." (DSF ¶ 69; PRDSF ¶ 69).

According to Maquet, Sanders also recommended that McCormick receive a write-up for failing to report the policy violation, but no action was taken at the time. (DSF ¶ 70). McCormick claims that he had reported the violation. (PRDSF ¶ 70).

### F. Continuing Communication Allegations

Maquet alleges that Mueller continued to receive reports from McCormick's team that he lacked responsiveness and engagement with his team members. (DSF ¶ 71). McCormick claims that the only evidence of complaints against him from his team are from Woycke, the very person whose illegal conduct he allegedly reported. (PRDSF ¶ 17). McCormick also claims that Mueller began soliciting negative feedback about McCormick after McCormick reported illegal activity (PRDSF ¶ 71).

According to Maquet, Mueller learned on June 18, 2014 that McCormick's team thought he was "overwhelmed." (DSF ¶ 72). Mueller spoke with McCormick on June 19, 2014. (DSF ¶ 72; PRDSF ¶ 72). McCormick claims he was not overwhelmed. (PRDSF ¶ 72).

On June 26, 2014, McCormick missed a conference call with his direct reports and Merchant. (DSF ¶ 73; PRDSF ¶ 73). McCormick claims he missed the call because he was on another prescheduled call with Mark Burke. (PRDSF ¶ 73). Mueller called McCormick later that day and expressed her concerns that McCormick was not meeting expectations. (DSF ¶ 74; PRDSF ¶ 74). According to McCormick, Mueller said some of his team members came to her and complained that he should not have reported Cowoski and Woycke and was not a "team player." (PRDSF ¶ 74).

On July 7, 2014, McCormick attended a Point of Action ("POA") meeting in Cincinnati, Ohio. (DSF ¶ 75; PRDSF ¶ 75). McCormick opened the meeting by apologizing to the team for not being responsive. (DSF ¶ 76; PRDSF ¶ 76). However, McCormick said that he apologized because Mueller asked him to— not because he was actually unresponsive. (PRDSF ¶ 76).

At this meeting, McCormick stated that team members needed to keep their LinkedIn profiles up to date. (DSF ¶ 77; PRDSF ¶¶ 77). Maquet alleges he was implying that the team members should be looking for other jobs. (DSF ¶¶ 77). McCormick denies that his comment insinuated this. (PRDSF ¶¶ 77).

Mueller conducted interviews of McCormick's team between July 8 and July 10, 2014. (DSF ¶ 78; PRDSF ¶ 78). McCormick alleges that these interviews were "retaliatory" and "outcome-determinative interviews" designed to solicit negative feedback, because Maquet knew the team was dissatisfied because McCormick had reported Woycke. (PRDSF ¶ 78). Maquet says these interviews revealed that McCormick was unresponsive, unavailable for periods of time, rarely visited certain sales territories, and failed to manage or communicate with his team. (DSF ¶ 79). McCormick states that there were also positive comments, such as he was "a lot more engaged and answering emails

9

on a consistent basis." He claims that any dissatisfaction resulted from his team's disapproval of his having reported potentially illegal conduct. (PRDSF ¶ 79).

### G. July 10, 2014 Meeting Between McCormick and Mueller

On July 10, 2014, Mueller reviewed the team's concerns with McCormick. (DSF ¶ 80; PRDSF ¶ 80). McCormick acknowledged that there were times when people could not reach him or he did not respond promptly, and he did not doubt that his team may have believed that he had put together the POA meeting at the last minute. (DSF ¶ 81; PRDSF ¶ 81). At the meeting, Mueller questioned whether the situation was "recoverable at this point." (DSF ¶ 82; PRDSF ¶ 82). McCormick responded that his team was just retaliating against him because he had not supported Woycke. (DSF ¶ 83; PRDSF ¶ 83).

According to Maquet, Mueller did not think that McCormick handled the Cleveland Course incident inappropriately, and she did not get the impression that the team was retaliating against McCormick because of Woycke's situation. (DSF ¶ 84). McCormick claims Mueller did not investigate McCormick's allegations that his team was retaliating against him because he did not support Woycke. (PRDSF ¶ 84).

McCormick told Mueller that if she felt that he was not right for the position, he would like her to give him the opportunity to resign rather than have his employment terminated. (DSF ¶ 85; PRDSF ¶ 85).

### H. After the July 10, 2014 Meeting

According to Maquet, during a July 17, 2014 meeting, McCormick took Merchant aside and discussed the Cleveland Course investigations in front of other employees. (DSF ¶ 86). McCormick allegedly said his team was retaliating against him and that he had one foot out the door; Merchant allegedly inferred from this that McCormick was imminently leaving the company. (DSF ¶ 86). Merchant relayed this conversation to Mueller. (DSF ¶ 86; PRDSF ¶ 86). McCormick denies that he discussed the investigation in front of other employees. (PRDSF ¶ 86).

Mueller discussed her concerns with Odom, Maquet's then-Vice President of Sales, and Human Resources. (DSF ¶ 87). These individuals allegedly determined that McCormick should be allowed to resign. (DSF ¶ 87). McCormick denies that his job performance was the true motivation for this decision. (PRDSF ¶ 87).

Mueller told McCormick before a July 22, 2014 meeting that she had lost confidence in him, and asked him to resign. (DSF ¶ 89; PRDSF ¶ 89). McCormick had questions about resigning, so Mueller and McCormick called Sanders. (DSF ¶ 90; PRDSF ¶ 90). Sanders said that the resignation would be effective immediately, that McCormick would receive two weeks' pay if he returned all company property by July 25, 2014, and that the company would not enforce the relocation clawback or the noncompete agreement. (DSF ¶ 91; PRDSF ¶ 91).

McCormick claims that he did not have any intention of resigning and did not actually do so. (PRDSF ¶¶ 90-92). On July 29, 2014, McCormick emailed Odom and admitted that he had been unresponsive, but he stated concerns that members of his team were retaliating against him because of what happened to Woycke and Cowoski. (DSF ¶ 93; PRDSF ¶ 93). Maquet alleges that McCormick was applying to other jobs prior to the July 22, 2014 meeting with Mueller; McCormick claims that nevertheless he did not resign his position. (DSF ¶ 93; PRDSF ¶ 93).

On August 14, 2014, Sanders responded to McCormick's email, explaining that Mueller had multiple conversations with McCormick about his performance and the company had accepted McCormick's resignation. (DSF ¶ 94; PRDSF ¶ 94).

Effective January 1, 2015, Maquet promoted Flanigan to Cardiovascular Territory Manager, a position in which she is still employed. (DSF ¶ 95; PRDSF ¶ 95).

## I. Removal of the Action

McCormick initiated this action in Tennessee state court. (ECF No. 1). The matter was removed to the Middle District of Tennessee under diversity jurisdiction and then transferred to this district because of a forum-selection clause in McCormick's employment agreement. (ECF Nos. 1, 28).

## II.   LEGAL STANDARD

Now before the court is defendant Maquet's motion for summary judgment. (ECF No. 77). Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d

12

Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

## III.   DISCUSSION

### A. Applicable Law

New Jersey law applies to this controversy. Plaintiff McCormick is a Memphis, Tennessee resident and defendant Maquet is a Delaware limited liability company with its principal place of business in Wayne, New Jersey. (ECF Nos. 1 ¶ 4, 9 ¶ 2, 45 ¶¶ 1-2). McCormick signed a choice-of-law and forum-selection clause in his employment agreement. (ECF No. 9 ¶ 6). It provides:

> Governing Law; Forum Selection; Consent to Personal Jurisdiction.
> This Agreement, my employment, and its conclusion, will be
> governed by the laws of the State of New Jersey without giving

13

effect to any choice-of-law rules or principles that may result in the application of the laws of any jurisdiction other than New Jersey. I hereby expressly consent to the exclusive personal jurisdiction and venue of the state and federal courts located in New Jersey and agree that any lawsuit or claim concerning this Agreement, my employment, or the conclusion thereof, including but not limited to, all statutory employment discrimination claims, will be brought exclusively in either the state (Essex or Passaic counties, only) or federal court (District of New Jersey, Newark Vicinage, only) of New Jersey. I further agree that New Jersey is a convenient forum for any such suit, and waive any argument to the contrary.

(ECF No. 9 ¶ 6).

McCormick initially sued Maquet under the Tennessee Public Protection Act ("TPPA") in Tennessee state court. (ECF No. 1). The matter was removed to the Middle District of Tennessee under diversity jurisdiction. (ECF No. 1). The matter was then transferred to this district based on the forum-selection clause in McCormick's employment agreement. (ECF Nos. 1, 28). McCormick's second amended complaint sues Maquet under New Jersey's Conscientious Employee Protection Act ("CEPA"). (ECF No. 45).

McCormick's complaint invokes New Jersey law, specifically CEPA, and Maquet agrees that New Jersey law applies. (ECF Nos. 45, 77). The parties seem to agree, at least tacitly, that the contractual choice-of-law provision governs and renders New Jersey law applicable. Such provisions are usually accepted as long as there is some connection to the chosen jurisdiction:

> [S]everal courts have held that the district court judge may forgo an independent choice-of-law analysis if the parties have agreed, either expressly or tacitly, as to which state's laws should control their case. The agreed-upon forum must be plausible and have some connection to the matter in suit or the court will not accept the parties' selection.

19 Wright & Miller, *Federal Practice & Procedure* § 4506 (3d ed. 2018) (footnotes omitted); *cf. Brand Marketing Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 354 (3d Cir. 2015) (acknowledging that "[t]he parties agree that Pennsylvania law applies").

In New Jersey, parties' contractual choice of law governs unless it violates New Jersey's public policy. *Portillo v. Nat'l Freight, Inc.*, No. 15-cv-7908, 2018 WL 2859289, at *4-5 (D.N.J. June 11, 2018) (citing *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992)).

> New Jersey applies Section 187 of the Restatement (Second) of Conflicts of Laws, which provides that the law of the state chosen by the parties will apply, unless either:
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which * * * would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* (citing *Instructional Sys.*, 614 A.2d at 124). This matter concerns McCormick's employment and the reason for his termination or resignation. It appears to be within the ambit of the choice-of-law clause. Judge Campbell of the Middle District of Tennessee, in connection with transferring the action, has already suggested that the choice-of-law provision dictates the application of New Jersey law. (ECF No. 27).

New Jersey has a relationship with the dispute. Maquet's principal place of business is in Wayne, New Jersey, the agreement was sent from New Jersey, and McCormick occasionally traveled to New Jersey to attend training sessions and other company meetings. (ECF No. 9 ¶¶ 6-10, 12). New Jersey's CEPA is not contrary to the public policy of Tennessee; rather, the TPPA and CEPA appear very similar. *See Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) (discussing the TPPA); *Dzwonar v. McDevitt*, 828 A.2d 893, 900-04 (N.J. 2003) (discussing New Jersey's CEPA).

For those reasons, I will apply New Jersey law.

### B. CEPA

McCormick alleges that Maquet violated CEPA, a "whistleblower statute." He alleges that Maquet took adverse employment action against him as punishment for reporting conduct that he believed amounted to illegal kickbacks. McCormick raises genuine issues of material fact regarding why he was asked to resign. For that reason, Maquet's motion for summary judgment is denied.

CEPA was enacted to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994). To effectuate that aim, the statute provides, in relevant part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following: ...
> (c) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ...; or
>> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare....

N.J. Stat. Ann. § 34:19-3. A retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). To make out such a CEPA claim, a plaintiff must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
> (2) he or she performed a "whistle-blowing" activity described in N.J. [Stat. Ann. §] 34:19-3c;
> (3) an adverse employment action was taken against him or her; and

16

(4) a causal connection exists between the whistle-blowing activity
and the adverse employment action.

*Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003) (line breaks added).

The New Jersey Supreme Court has adopted the *McDonnell Douglas*
burden-shifting framework for analyzing CEPA claims. *See Winters v. N.
Hudson Reg'l Fire & Rescue*, 50 A.3d 649, 662 (N.J. 2012). Under this test, the
employee carries the initial burden of establishing a prime facie case of
retaliation. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802
(1973). The burden then shifts "to the employer to articulate some legitimate,
nondiscriminatory reason" for the adverse employment action. *Id.* (quoting
*McDonnell Douglas*, 411 U.S. at 802). If the employer can do so, "the
presumption of retaliatory discharge created by the prima facie case disappears
and the burden shifts back to the [employee]." *Id.* (quoting *Blackburn v. United
Parcel Serv., Inc.*, 179 F.3d 81, 92 (3d Cir.1999)). The employee then must
persuade the "fact finder that the employer's reason was false 'and that
[retaliation] was the real reason.'" *Id.* The ultimate burden of proof remains
with the employee. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804-05).

### i. The Prima Facie Case

The plaintiff bears the burden of establishing a prima facie case of
unlawful retaliation. *See Schlichtig v. Inacom Corp.*, 271 F. Supp. 2d 597, 611
(D.N.J. 2003). The initial burden of establishing a prima facie case is "not
intended to be onerous." *See Marzano v. Comput. Sci. Corp.*, 91 F.3d 497, 508
(3d Cir. 1996).

### 1. Reasonable Belief

A jury could find that McCormick had an objectively reasonable belief
that an anti-kickback statute was violated. The threshold CEPA issue is
whether the plaintiff has identified either "a law, or a rule or regulation
promulgated pursuant to law" N.J. Stat. Ann § 34:19–3c(1), or "a clear mandate
of public policy concerning the public health, safety or welfare," N.J. Stat. Ann.
§ 34:19-3c(3), which the employer has allegedly violated. *See Mehlman v. Mobil*

*Oil Corp.*, 707 A.2d 1000, 1009 (N.J. 1998). New Jersey courts have emphasized that the "significant element" is that the employee must have an

> *objectively* reasonable belief ... that such activity is either illegal, fraudulent or harmful to the public health, safety or welfare *and* that there is a substantial likelihood that the questioned activity is incompatible with a constitutional, statutory or regulatory provision, code of ethics, or other recognized source of public policy.

*Massarano v. New Jersey Transit*, 948 A.2d 653, 663 (N.J. Super. Ct. App. Div. 2008) (quoting *Mehlman*, 707 A.2d at 1015).

In *Dzwonar*, the New Jersey Supreme Court clarified how a plaintiff proceeds with a CEPA claim:

> [N.J. Stat. Ann. § ]34:19–3c does not require a plaintiff to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true. Instead, a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred. In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.

*Dzwonar*, 828 A.2d at 901-02.

McCormick expressed concern that Maquet employees covering the CVOR Manager's hotel, entertainment, and food constituted a kickback. The federal Anti-Kickback Act, 41 U.S.C. § 8701 *et seq.*, ("AKA") prohibits kickbacks in connection with federal contracts. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS") covers hospitals and medical device companies. The AKS makes unlawful the knowing and willful solicitation, receipt offer, or payment of "any remuneration (including any kickback, bribe or rebate) directly, indirectly, overtly or covertly, in cash or in kind" to induce or reward the

referral, purchase, order, lease or recommendation of any item or service that may be paid for under a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(1)-(2).

Maquet argues that McCormick did not have an objectively reasonable belief that the incident violated the AKA or the AKS. First, Maquet claims that neither Maquet nor the CVOR Manager's hospital-employer "are alleged to have been prime contractors or subcontractors on a federal contract within the meaning of the AKA." (ECF No. 77, pp. 27). Second, Maquet argues that trade association guidance and company internal policies—which are based on anti-kickback statutes—cannot be used to support a reasonable belief that the AKA or AKS were violated. (ECF No. 77, pp. 28-30). Third, Maquet compares the lodging, entertainment, and food allegedly given to the CVOR Manager to other "token" items that do not rise to the level of a kickback. (ECF No. 77, pp. 30-31).

A jury could find McCormick's belief that an anti-kickback statute was violated was reasonable. Whether Woycke and Cowoski's conduct fell under the statute, to be sure, involves some legal intricacies. But "[t]he object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare." *Mehlman v. Mobil Oil Corp.*, 702 A.2d 1000, 1015-16 (N.J. 1998). Establishing a prima facie case is not intended to be onerous. A jury could find McCormick's belief objectively reasonable. I therefore find that, for the purposes of this summary judgment motion, McCormick has satisfied the first prong of the prima facie case.

### 2. Whistleblowing Activity

McCormick engaged in a whistleblowing activity as defined by CEPA. It is undisputed that Tracy Flanigan had reported the CVOR Manager's attendance at the Cleveland Course before McCormick reported it. Maquet argues that McCormick did not engage in a "whistleblowing" activity because

19

defendant was already aware of the issue. Maquet lacks persuasive state precedent to support this argument.

The Supreme Court of New Jersey has instructed courts that CEPA "should be construed liberally to effectuate its important social goal." *See Hitesman v. Bridgeway, Inc.*, 93 A.3d 306, 316 (N.J. 2014). In the absence of persuasive state precedent, "this Court declines to construe CEPA inapplicable to situations where an employer is already aware of violations of laws, regulations, or clear mandates of public policy." *Martelack v. Toys R US*, No. 13-cv-7098, 2016 WL 762656, at *4 (D.N.J. Feb. 25, 2016); *see also Rivera v. City of Camden Bd. of Educ.*, 634 F. Supp. 2d 486, 489 n.3 (D.N.J. 2009) ("The Court expresses no opinion as to the scope of CEPA's protection for a would-be 'whistle-blower' who provides information about an employer's activity, policy, or practice, when the recipient of that information was, in fact, already aware of the activity, policy or practice in question.").

Defendant notes that Minnesota law does not consider such reporting to be "whistleblowing." (ECF No. 77, pp. 24-25); *see e.g., Pedersen v. Bio-Medical Applications of Minn.*, 992 F. Supp. 2d 934, 939 (D. Minn. 2014) (finding that "the mere mention of a suspected violation that the employer already knows about" does not constitute whistleblowing activity). But this court is applying New Jersey's whistleblowing statute and will not construe the statute based on Minnesota law in the absence of direction from New Jersey courts.

McCormick thus has met the second prong of the prima facie case for purposes of this summary judgment motion.

### 3. Adverse Employment Action

Some circumstances surrounding McCormick's departure are disputed. The parties agree, however, that McCormick's requested resignation could be found to be an adverse employment action. *See also Simms v. Trimac Transp. E., Inc.*, No. 8-cv-2694, 2009 WL 1587598, at *12 (E.D. Pa. June 8, 2009); *Wong v. Thomas,* No. 5-cv-2588, 2008 WL 4630380, at *6 (D.N.J. Oct. 17, 2008). McCormick meets the third prong of the prima facie case.

### 4. Causal Connection

McCormick has presented evidence that could lead a jury to find a causal connection between his June 2014 reporting of the Cleveland Course incident and his requested resignation in July 2014. Proof of causation may depend on three types of evidence: temporal proximity, a pattern of antagonism by the employer in response to the protected activity, and the employer's knowledge of that activity. *Walsh v. Wal Mart Stores, Inc.*, 200 F. App'x 134, 136 (3d Cir. 2006). "While evidence of only one factor is generally insufficient to establish causation, evidence of all three is not necessary, so long as the claim reasonably supports an inference of causation." *Id.*; *see also Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

In the present case, temporal proximity supports a genuine dispute regarding causation. McCormick allegedly engaged in whistleblowing activity in mid-June 2014; a chain of consequences, including inquiry into McCormick's job performance, allegedly occurred almost immediately, culminating in the request that he resign at the end of July 2014. When protected conduct is closely followed by a retaliatory action, an inference of causation is possible. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); *see also Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (finding that three weeks between whistleblowing and retaliation supported an inference of causation at the prima facie stage). Additionally, McCormick has adduced evidence that Maquet and the individuals who purportedly decided to ask him to resign were aware of his alleged whistleblowing activity. He also has testified that there was general dissatisfaction in the ranks about his whistleblowing activity. These circumstances are sufficient to suggest causation for purposes of the initial *McDonnell Douglas* analysis.

### ii. Legitimate Reason

Maquet and McCormick do not focus on the second or third elements of the *McDonnell Douglas* burden-shifting framework: Maquet's proof of a

legitimate, non-retaliatory reason for dismissal, and McCormick's responding proof that the proffered reason was pretext for retaliation.

Maquet proffers evidence and testimony that McCormick was unresponsive and lacked engagement with his team. Maquet claims McCormick failed to regularly interact with members of his team and failed to respond to emails. McCormick allegedly regularly cancelled meetings and phone calls. In May 2014, Mueller emailed McCormick to ask, "Is everything OK? I sent several emails and have not heard back from you." (DSF ¶ 15; PRDSF ¶ 15). Seven hours later, McCormick responded, stating that he could not explain how he "missed the multiple emails yesterday." (DSF ¶ 16; PRDSF ¶ 16).

After the alleged whistleblowing incident, there is more evidence to suggest that McCormick lacked engagement and was not sufficiently responsive. McCormick's training certifications were non-compliant, he missed a conference call, and members of his team reported that he was not meeting expectations. McCormick apologized to his team members for not being responsive after Mueller addressed this concern with him. (DSF ¶ 76; PRDSF ¶ 76). Mueller interviewed members of McCormick's team, who stated that he was non-responsive, unavailable for periods of time, rarely visited certain sales territories, and failed to engage or communicate with his team. (DSF ¶ 79).

On July 10, 2014, Mueller reviewed these concerns with McCormick, who acknowledged shortcomings. (DSF ¶ 81; PRDSF ¶ 81). McCormick even told Mueller that if she felt that he was not right for the position, he would like her to give him the opportunity to resign rather than have his employment terminated. (DSF ¶ 85; PRDSF ¶ 85).

In sum, while the parties do not substantially address this element, Maquet has provided evidence of a legitimate, non-retaliatory reason for asking McCormick to terminate. Maquet's evidence suggests that McCormick lacked sufficient engagement and responsiveness with his team and supervisors.

### iii. Pretext

At this stage of the burden-shifting framework, the burden is on McCormick to show that Maquet's proffered reason for asking him to resign is pretext for retaliation.

McCormick argues that he was actually responsive and engaged with his team, there was no official written policy requiring responses to emails within twenty-four hours, and Maquet solicited negative feedback to create a poor record for him. (ECF No. 78, pp. 20-25). He also claims Maquet's evidence shows merely "a clash of personalities." (*Id.* p. 25). Employers, however, may make employment decisions based on personality conflicts. *See, e.g., Mitchell v. Wachovia Corp.*, 556 F. Supp. 2d 336, 348 (D. Del. 2008).

McCormick has not definitively established that Maquet's proffered reason for asking his to resign was pretextual, and Maquet has much evidence to work with. Maquet did not ignore the Cleveland Course incident; it directed Woycke to resign, and gave Cowoski a write-up. Maquet even promoted Flanigan—the initial whistleblower—to McCormick's position. And there is evidence that McCormick was unresponsive, lacked engagement, and did not work effectively with supervisors or subordinates.

Still, McCormick is not moving for summary judgment; Maquet is. The court cannot find facts or weight credibility on this motion. McCormick has submitted enough to raise a factual question as to why Maquet took an adverse employment action against him. "[S]ummary judgment is in fact rarely appropriate in this type of case. Simply 'by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment." *Marzano v. Comput. Sci. Corp., Inc.*, 91 F.3d 497, 509-10 (3d Cir. 1996). A reasonable jury would not be required to, but could, find that Maquet terminated McCormick for reporting the Cleveland Course incident. No more is required for the court to deny summary judgment.

## IV. CONCLUSION

For the foregoing reasons, defendant Maquet's motion for summary judgment (ECF No. 77) is denied.

An appropriate order accompanies this opinion.

Dated: August 3, 2018

**KEVIN MCNULTY**
**United States District Judge**